**Eugene COLE, Plaintiff,**

v.

**Thomas A. FULCOMER, Defendant.**

**Civ. No. 83–0041.**

United States District Court,
M.D. Pennsylvania.

May 15, 1984.

Allen C. Welch, Clearfield, Pa., for plaintiff.

Jerome T. Foerster, Deputy Atty. Gen., Harrisburg, Pa., for defendant.

OPINION

MUIR, District Judge.

I. Introduction.

Plaintiff Eugene Cole, an inmate at the State Correctional Institution at Huntingdon, Pennsylvania (hereinafter called "Huntingdon"), claims in this civil rights action that a prison regulation which requires him to cut his hair infringes his right to free exercise of his religion under the first amendment of the United States Constitution. Defendant Thomas A. Ful-

comer, the superintendent at Huntingdon, claims that the challenged regulation must be upheld despite the fact that it interferes with Cole's religious practice because it promotes prison security. Cole instituted this lawsuit in January 1983, after prison officials had placed Cole in disciplinary custody for 30 days because Cole refused to have his hair cut in conformity with the hair length regulation. Cole seeks declaratory and injunctive relief. This case was tried by the Court sitting without a jury on April 17, 1984. The following are the Court's findings of fact, discussion, and conclusions of law.

## II. Findings of Fact.

1. Plaintiff Eugene Cole is a prisoner currently incarcerated at Huntingdon.

2. Defendant Thomas A. Fulcomer is the superintendent at the state correctional institution at Huntingdon.

3. Cole was born on February 29, 1956 at Wichita, Kansas, the son of a Caucasian mother and a Cherokee Indian father.

4. Cole adheres to Native American culture and the traditional religious beliefs embodied in that culture.

5. Cole sincerely believes in a "Great Spirit" which is inextricably bound in with nature.

6. Cole sincerely believes that long hair is symbolic of the Great Spirit and that interference with hair growth is interference with his spiritual world.

7. In March 1982, Cole was committed to the custody of correctional authorities at Huntingdon.

8. Upon Cole's arrival at Huntingdon, a correctional officer confiscated from Cole an eagle feather which Cole considered his sacred prayer feather.

9. Administrative Directive 807 promulgated by the Pennsylvania Bureau of Correction sets grooming standards for inmates confined at Huntingdon.

10. Administrative Directive 807 states that "The purpose of this directive is to establish guidelines for resident grooming that permit individuality and are consistent with practices in the community." It does not relate hair length to prison security.

11. Administrative Directive 807 provides that, with regard to male hair styles "Hair that does not fall below the top of the collar in length, a beard or goatee no longer than three inches, a moustache and sideburns shall be permitted provided they are neat and clean." Administrative Directive 807 does not impose any restriction on hair length for female inmates.

11A. Prior to the adoption and implementation of Administrative Directive 807 in 1972, inmates at state correctional institutions were required to wear their hair short.

12. On January 4, 1983, when Cole's hair was longer than permitted by Administrative Directive 807, a correctional officer ordered Cole to get his hair cut to conform therewith. Cole refused to follow this order. The correctional officer then issued a misconduct report charging Cole with refusing to obey the order to get his hair cut.

13. On January 6, 1983, the Huntingdon hearing committee convened to dispose of Cole's misconduct report. At the hearing, Cole contended that it was against his religious beliefs stemming from his heritage as a Cherokee to get his hair cut. The hearing committee found Cole guilty of refusing to obey the order and sentenced him to 30 days disciplinary confinement.

14. Since January, 1983, Cole has submitted to prison officials' orders to get his hair cut in order to avoid further punishment.

15. Inmates at Huntingdon are permitted "contact visits" with family and friends.

16. Before a contact visit, inmates are required to change into special clothing before entering the visiting room. After removing his standard prison clothing, the inmate is strip-searched and moves, completely nude, into another room where he puts on the special clothing.

17. After the visit, the aforementioned process is reversed and a strip search is performed.

18. Inmates at times attempt to obtain drugs from visitors and smuggle the drugs into the prison.

19. Administrative Directive 203, promulgated by the Pennsylvania Bureau of Correction, governs the procedure for searching an inmate.

20. Administrative Directive 203 provides that strip searches of inmates shall be conducted "before and after every contact or open visit."

21. Administrative Directive 203 provides that correctional officers conducting a strip search are permitted to "run a finger or large wide toothed comb through the hair."

22. Administrative Directive 203 requires that correctional officers who conduct a strip search before and after a contact visit shall examine the inmates' head, including the hair, "behind the ears, into the mouth, under the tongue and into nostrils." The correctional officer also examines the armpit area, groin area, and, while the inmate is bent over, the buttocks.

23. Inmates are photographed upon reception into the correctional system and these photographs are retained in the inmate's Bureau of Correction file.

24. Prison inmates sometimes are rephotographed if changes are noticed in their hair line or their facial features.

25. Inmates are not consistently required to be clean shaven and have their hair cut in conformity with Administrative Directive 807 when they are photographed upon commitment to the correctional system.

26. If an inmate who has a beard or long hair escapes, he could easily alter his appearance by removing his beard and long hair.

27. Predatory homosexuals present a serious security problem at state correctional facilities.

28. Many fights between inmates result from one inmate attempting to seek sexual favors from another.

29. Prisoners who work in food service may be required to wear a hat or a net or both in order to prevent hair from falling into food.

30. Guards and inmates sometimes are hostile toward inmates against whom rules or regulations are not enforced.

31. Prison officials do not maintain any records to indicate that security problems arise when Administrative Directive 807 is not enforced against a prisoner.

## III. Discussion.

In orders dated December 28, 1983 and February 29, 1984, this Court ruled on the parties' motions for summary judgment and discussed in detail Cole's claim and the Defendants' responses thereto. Some of our discussion of this case in this opinion is adopted from our prior orders.

### A. Sincerely Held Religious Belief.

 The first amendment provides that the government shall not prohibit the free exercise of religion. *Cantwell v. Connecticut*, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). An individual can claim protection under the free exercise clause only for sincerely held beliefs properly characterized as "religious". *United States v. Seeger*, 380 U.S. 163, 85 S.Ct. 850, 13 L.Ed.2d 733 (1965); *Wisconsin v. Yoder*, 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972). In this Court's December 28, 1983 order, we granted Cole's motion for summary judgment on his claim that Native American belief constitutes a "religion" within the meaning of the first amendment.

 At trial, Fulcomer attempted to demonstrate that Cole is insincere in his religious beliefs because he has not actively "practiced" his religion throughout his life and, in the time since he has been engaged in active practice of his religion, he has not done all that he might do in the way of formal observance of his religion. While Fulcomer did establish these facts, we think they are irrelevant to the question of whether Cole is presently sincere in his religious beliefs. Many individuals who sincerely believe in Christianity or Judaism

have not held their religious belief throughout their lives. Likewise, many sincerely religious individuals engage in formal observance of religious practices infrequently. We doubt that Fulcomer would question the sincerity of an individual's belief in Christianity because that person did not attend church services on a regular basis. This Court is of the view that Cole is sincere in his religious beliefs.

### B. Hair Length and Prison Security.

### 1. The Legal Standard.

The parties' major dispute centers on whether the Court must defer to Fulcomer's contention that Administrative Directive 807 is justified by security concerns. Fulcomer argues that Administrative Directive 807 must be upheld because it (1) facilitates identification of prisoners; (2) prevents concealment of contraband; (3) prevents homosexuality among prisoners; and (4) promotes safety and sanitation. Cole argues that Administrative Directive 807 must yield to his constitutional right to retain uncut hair as an expression of his religious belief because Fulcomer's views regarding the security concerns allegedly served by Administrative Directive 807 are unreasonable or that enforcement of the regulation against him is an exaggerated response to these concerns.

In *St. Claire v. Cuyler*, 634 F.2d 109 (3d Cir.1980), the Court of Appeals set out its interpretation of the constitutionally required "mutual accommodation" between a prisoner's right to free exercise of his religion and the legitimate goals and policies of prison administrators. *Id.* at 112; *Inmates of Allegheny Jail v. Pierce*, 612 F.2d 754, 759–60 (3d Cir.1979). After rejecting the argument that in cases where a prison regulation impinges on a prisoner's free exercise right the regulation must be struck down unless it promotes prison security in the manner least restrictive of the prisoner's rights, the Court articulated a standard it felt consistent with the deferential review required by the United States Supreme Court with respect to the decisions of prison officials. In challenging a prison regulation that imposes a restriction on the prisoners' first amendment rights, the prisoner has the burden of demonstrating that the Court should not defer to the prison officials' judgment. Such a burden falls on the prisoner as soon as the state produces any evidence that permitting the exercise of first amendment rights creates a potential danger to prison security. Once the state has made such a showing, the prisoners' first amendment challenge must fail unless he presents substantial evidence that prison officials' views regarding institutional security are unreasonable or that their response to legitimate security concerns are "exaggerated." *St. Claire*, 634 F.2d at 114–15.

In light of *St. Claire*, we must evaluate whether Cole has shown that Fulcomer's beliefs regarding the relationship between the hair length restriction in Administrative Directive 807 and institutional security are unreasonable or that the enforcement of Administrative Directive 807 against Cole constitutes an exaggerated response to Fulcomer's security concerns.

### 2. Administrative Directive 807.

Administrative Directive 807 provides that: "Hair that does not fall below the top of the collar in length, a beard or goatee no longer than three inches, a moustache and sideburns shall be permitted provided they are neat and clean." While Fulcomer's position throughout this litigation has been that Administrative Directive 807 is enforced in order to promote institutional security, we question this assertion. It appears to the Court that two goals other than the promotion of institutional security may be behind enforcement of Administrative Directive 807. First, Fulcomer may simply be seeking to resist Cole's effort to force prison officials to recognize and to make any effort to accommodate his religious belief.

It also appears that Administrative Directive 807 may be a means of forcing prisoners to conform to the grooming practices of a majority of the members of the

community at large. Indeed, Administrative Directive 807 itself states that it has this purpose and states nothing about a relationship between hair length or other grooming practices and institutional security.

Paragraph 1 of Directive 807 reads as follows:

I. *Purpose.* The purpose of this directive is to establish guidelines for resident grooming that permit individuality and are consistent with practices in the community.

If the sole purpose of Administrative Directive 807 is to enforce conformity with community practice, it would deserve no deference as against Cole's first amendment rights.

Despite the above, we found credible some of the testimony presented by Fulcomer regarding prison officials' security concerns. We therefore proceed to our discussion of whether enforcement of Administrative Directive 807 against Cole constitutes an exaggerated response to Fulcomer's security concerns or whether those concerns are unreasonable. We will address Fulcomer's stated concerns in series.

a. Identification.

The Defendants claim that because Administrative Directive 807 prevents inmates from having long hair it facilitates identification of prisoners and thereby prevents them from significantly altering their appearance so as more readily to escape from custody. This justification presupposes that most or all inmates in state correctional institutions are photographed with their hair cut in conformity with Administrative Directive 807 and that inmates are consistently required to conform to the grooming standards set out in Administrative Directive 807.

Cole recognizes that if prison officials took photos of prisoners when their hair is cut in conformity with Administrative Directive 807 their goal of facilitating identification of prisoners would be served. Cole proved at trial, however, that although inmates are photographed upon reception into the correctional system, these photographs sometimes are taken when an inmate has long hair. Cole also proved that several inmates currently incarcerated at Huntingdon have hair substantially longer than that permitted by Administrative Directive 807.

In response to Cole's evidence that not all inmates in the state prison system have photographs in their files depicting them with their hair cut in conformity with Administrative Directive 807, Fulcomer argued that it is inevitable that some prisoners will be able to conceal the fact that their hair is long or otherwise stymy the efforts of prison officials to maintain photographs of the inmates with short hair. Fulcomer also notes that inmates are periodically rephotographed so that their file photographs depict current likenesses of the inmates.

We find it incredible that prison officials cannot readily identify inmates with long hair and require them to cut it prior to being photographed, either upon entry into the correctional system or at any time during the term of the prisoners' incarceration. Consequently, we find incredible Fulcomer's assertion that enforcement of Administrative Directive 807 is a reasonable response to prison officials' goal of prohibiting inmates from having long hair in connection with a system of photographic identification of prisoners. The haphazard operation of the photographic identification system at least at the Huntingdon prison belies Fulcomer's claim.

b. Contraband.

Fulcomer maintains that Administrative Directive 807 is a reasonable response to prison officials' security concerns because restriction of hair length prevents inmates from concealing contraband such as weapons or controlled substances in their hair. Fulcomer alleges that he is concerned that inmates with long hair will better be able to conceal contraband introduced into the prison by visitors and transferred to the prisoner during the "contact visits" allowed between inmates and visitors at Hunting-

don. We believe that Fulcomer is legitimately concerned that an inmate with long hair has some additional opportunity to hide contraband as compared with an inmate with short hair. However, the additional opportunity is minimal and, in light of existing procedures for the detection of contraband, unlikely to pose any significant risk to institutional security.

Inmates are strip-searched subsequent to contact visits. In order to detect contraband concealed in an inmate's hair, a guard may run his finger or a comb through the inmate's hair. Fulcomer did not present any evidence that it would be substantially more burdensome to search an inmate with long hair than to search an inmate with short hair. Consequently, enforcement of Administrative Directive 807 against Cole is an exaggerated response to the Defendants' concern with preventing concealment of contraband.

### c. Homosexuality.

Prison officials maintain that Administrative Directive 807 promotes institutional security by reducing the incidence of assaults on other prisoners by predatory homosexuals and generally reducing the security problems alleged to result from prison homosexuality. Fulcomer claimed that predatory homosexuals are more likely to attack or become involved in a fight over a long-haired inmate than a short-haired inmate. Fulcomer's witnesses testified that on the basis of their experience, they believe that a correlation exists between security problems resulting from prison homosexuality and long hair. They also testified that prison officials in other states recognize this problem. Finally, they testified that "incident reports" at Huntingdon and other Pennsylvania prisons would indicate a correlation between long hair and increased homosexuality-related security problems.

We do not doubt the sincerity of Fulcomer's belief that a correlation between homosexuality-related security problems and long hair exists. Nevertheless, we find Fulcomer's belief unreasonable. Fulcomer's witnesses could point to no documenta-

ry evidence of the claimed correlation. Although Fulcomer claims that prison incident reports reflect this correlation, he did not produce even a single incident report so to indicate despite the fact that this litigation began over 14 months ago. Although the witnesses testified that prison officials throughout the United States recognized and shared Fulcomer's concern with the correlation between long hair and homosexuality-related security problems, Fulcomer could not point to any document evidencing this concern not to mention any document tending to indicate that this concern is reasonable.

Finally, all of the Defendants' witnesses testified that Directive 807 is consistently enforced throughout the Pennsylvania prison system but that a few inmates nevertheless manage to grow their hair long and escape detection. Assuming this to be true, this fact suggests that, as we conclude, the prison officials' belief regarding the correlation between long hair and homosexuality is founded neither on experience nor on the writings of others. Fulcomer did not attempt to prove that this allegedly small group of inmates who have been able to grow their hair long has been subject to a greater number of attacks by predatory homosexuals than other prisoners.

### d. Safety and Sanitation.

We also found incredible Fulcomer's testimony that allowing an inmate to wear his hair long involves a substantial risk to safety and sanitation when the inmate works around machinery or in the prison food service. Inmates who work in food service may be required to wear a hat or a net to cover their hair. Likewise, with regard to a possible safety problem caused by an inmate with long hair who works around machinery, Administrative Directive 807 appears to be an exaggerated response to that concern in that inmates could easily be required to wear a hat, cap or net in order to avoid any danger.

IV. Conclusions of Law.

1. Native American Indian culture and belief is a religion within the meaning of the first amendment to the United States Constitution.

2. Eugene Cole is a sincere adherent of Native American religious belief.

3. The enforcement of Administrative Directive 807 is an exaggerated response to Fulcomer's concern with preventing the introduction of contraband secreted in an inmate's hair into the institution through the visiting room.

4. Fulcomer's concern that inmates who escape from prison may be better able to avoid being identified if Administrative Directive 807 is not enforced is exaggerated.

5. Fulcomer's concern that institutional security will be threatened by increased homosexual activity if inmates are allowed to wear long hair is unreasonable.

6. Enforcement of Administrative Directive 807 is an exaggerated response to Fulcomer's concern with the promotion of safety and sanitation in connection with the operation of machinery and preparation of food by inmates.

7. Fulcomer's predecessor in office and his agents acted in good faith in enforcing Administrative Directive 807 against Cole.

8. Fulcomer has violated Cole's first amendment rights by disciplining him for failing to cut his hair because of his religious beliefs.

9. Enforcement of Administrative Directive 807 against Cole constitutes a violation of Cole's right to free exercise of his religious belief.