Eugene COLE, Appellee,

v.

R. FLICK, Correction Officer, Charles Zimmerman, Supt., Thomas A. Fulcomer, Anthony Zumpetta, Deputy Superintendent, C.R. Myers, Captain of Guard, K.R. Hileman, Correction Officer S.L. Grove, Correction Officer, Thomas A. Fulcomer, Appellant.

No. 84–5407.

United States Court of Appeals, Third Circuit.

Argued Feb. 11, 1985.

Decided March 29, 1985.

Rehearing and Rehearing In banc Denied May 1, 1985.

Allen C. Welch (Argued), Clearfield, Pa., for appellee.

Jerome T. Foerster (Argued), Deputy Atty. Gen., Harrisburg, Pa., for appellant.

Before GARTH, BECKER and ROSENN, Circuit Judges.

## OPINION OF THE COURT

BECKER, Circuit Judge.

This is an appeal by Thomas A. Fulcomer, Warden of the State Correctional Institution at Huntingdon, Pennsylvania, from a judgment of the district court awarding declaratory and injunctive relief to Eugene Cole, a half-blooded Cherokee Indian currently incarcerated at Huntingdon, on the grounds that a prison regulation that requires Cole to maintain his hair length above the collar infringes upon his right to exercise freely his religious beliefs under the first amendment to the United States Constitution. For the reasons that follow,

we reverse and direct that judgment be entered for appellant.

## I. BACKGROUND FACTS [1] AND PROCEDURAL HISTORY

Cole, the son of a Caucasian mother and a Cherokee Indian father, adheres to the native American (Indian) religion and the traditional religious beliefs embodied therein.[2] Among the precepts of the Indian religion is that long hair is symbolic of the Great Spirit, *see supra* note 2, and that interference with hair growth is interference with one's spiritual world.

Administrative Directive 807 promulgated by the Pennsylvania Bureau of Correction sets grooming standards for inmates confined in Pennsylvania correctional institutions, including Huntingdon. The Directive states that its purpose "is to establish guidelines for resident grooming that permit individuality and are consistent with practices in the community." *Cole v. Fulcomer*, 588 F.Supp. 772, 773 (M.D.Pa.1984) (finding of fact number 10). The Directive further provides that, with regard to male hairstyles: "Hair that does not fall below the top of the collar in length, a beard or goatee no longer than three inches, a moustache and sideburns shall be permitted provided that they are neat and clean." *Id.* (finding of fact number 11).[3]

On January 4, 1983, when Cole's hair was longer than permitted by Directive 807, a correctional officer ordered him to get his hair cut to conform with the rule. Cole refused, and the correctional officer issued a misconduct report charging him with refusing to obey the order. On January 6, 1983, the Huntingdon Hearing Committee convened to dispose of the misconduct report. At this hearing, Cole submitted that it was against his religious beliefs to get his hair cut; nevertheless, the Hearing Committee found Cole guilty of refusing to obey the order and sentenced him to thirty days disciplinary confinement. Since January 1983 Cole has acquiesced to prison officials' orders to get his hair cut in order to avoid further punishment. *Id.* (findings of fact numbers 12–14).

Following the conviction Cole instituted the present action pursuant to 42 U.S.C. § 1983 in the district court for the Middle District of Pennsylvania, naming as defendants the then superintendent of Huntingdon (Charles H. Zimmerman) and seven others. Cole sought money damages and injunctive relief. Zimmerman was subsequently transferred to the State Correctional Institution at Graterford and his successor, Thomas Fulcomer, was substituted as a defendant. Prior to trial Cole amended his action by withdrawing his claim for damages and dropping the action against all defendants except Superintendent Fulcomer. At the bench trial conducted by the district court, Cole, another inmate, and a member of the Native American Support Project, testified on Cole's behalf. Fulcomer, Zimmerman, Glenn R. Jeffes, the Pennsylvania Commissioner of Corrections, and Joseph F. Mazurkiewicz, the Superintendent of the State Correctional Institution at Rockview each testified as an expert in prison administration for the Commonwealth (the real defendant in interest). Additionally, Mazurkiewicz, who has a doctorate in clinical psychology, was permitted to testify as an expert in that field.

The district court, in a written opinion, *Cole v. Fulcomer*, 588 F.Supp. 772 (M.D. Pa.1984), found that Cole's beliefs were

---

**1.** In this segment of the opinion we set forth only uncontested facts.

**2.** As Cole described it, the philosophy of the Indian religion is to respect all life and take care of mother earth. He explained its basic precept by stating: "When you take something from the earth, replace it with something so the circle of life can continue as the Great Spirit meant it to be." Cole described the Great Spirit as the creator of all, one who is inextricably bound in with nature. He also explained that the religion has the equivalent of the church in the "Sweat Lodge"; this is where the Indian people go to purify body and mind and become closer to nature and the Great Spirit. The religion, Cole also explained, has its sacred objects, such as the pipe and the sacred eagle feathers.

**3.** Prior to the adoption and implementation of Administrative Directive 807 in 1972, inmates at state correctional institutions were required to wear their hair even shorter.

religious in character and that they were sincerely held.[4] The court also found that Directive 807 was an unreasonable or exaggerated response to (legitimate) prison security concerns. The court thus declared that enforcement of the directive against Cole was a violation of his right to exercise his religion freely. Accordingly, the court entered judgment in Cole's favor, enjoining Fulcomer and his agents from enforcing the provisions of Directive 807 so as to prevent Cole from allowing his hair to grow naturally. This appeal followed.

## II. THE COMMONWEALTH'S JUSTIFICATIONS FOR DIRECTIVE 807

At trial, the Commonwealth offered (and supported by evidence) five discrete bases to justify the directive. We turn now to a description of these justifications and the evidence offered in their support. In the course of our discussion, we will also relate Cole's contentions addressed to each justification and the district court's response.

### A. *Identification*

According to Dr. Mazurkiewicz, "a fundamental purpose of the grooming standards in Directive 807 is to promote prison security through the quick identification of prisoners within the institution and to facilitate the recapture of escaped felons." The Commonwealth's primary concern in this regard relates to the radical changes in appearance that can be accomplished by simply varying hair length. In the view of the Commonwealth's (expert) witnesses, once an inmate is permitted to have hair longer than the length outlined in the directive, his ability to alter his appearance by cutting his hair greatly increases, thus aiding an inmate who escapes. The experts also testified that longer hair impairs the ability of prison officials to identify prisoners within the institution for such activities as roll call, mail call, purchases at

the commissary, and the issuance of visiting room passes.

Cole responded principally by developing on cross examination and by documentary proffers the fact that there were inmates at Huntingdon with file photographs depicting them with long hair and full beards. Cole was able, however, to demonstrate that only three or four inmates out of over 1500 at Huntingdon had hair longer than regulations allow. One of these was Cole himself and another was Stephen R. Wilson, a follower of the Rastafarian religion, who is the beneficiary of similar declaratory and injunctive relief by order of the district court for the Western District of Pennsylvania.[5] Moreover, the Commonwealth introduced evidence that the hair length directive was strictly enforced at other Pennsylvania correctional institutions.

The district court rejected the "identification" justification, stating:

We find it incredible that prison officials cannot readily identify inmates with long hair and require them to cut it prior to being photographed, either upon entry into the correctional system or at any time during the term of the prisoners' incarceration. Consequently, we find incredible Fulcomer's assertion that enforcement of Administrative Directive 807 is a reasonable response to prison officials' goal of prohibiting inmates from having long hair in connection with a system of photographic identification of prisoners. The haphazard operation of the photographic identification system at least at the Huntingdon prison belies Fulcomer's claim."

*Cole*, 588 F.Supp. at 776.

### B. *The Contraband Justification*

The Commonwealth contends that Directive 807 is a reasonable response to prison officials' security concerns because restriction of hair length prevents inmates from concealing contraband, such as weap-

---

**4.** These findings are not challenged.

**5.** That order is the subject of a pending appeal and cross appeal in this court, Nos. 83–5914 and 84–3023.

ons or controlled substances, in their hair. It offered evidence through its experts that inmates with long hair will better be able to conceal contraband introduced into the prison by visitors and transferred to the prisoner during the "contact visits" allowed between inmates and visitors at Huntingdon.

The district court conceded the legitimacy of the Superintendent's concern about contraband, but concluded that the additional opportunity for inmates with long hair to receive contraband was "minimal and, in light of existing procedures for the detection of contraband, unlikely to pose any significant risk to institutional security." 588 F.Supp. at 777. The court also noted that, in accordance with the provisions of Administrative Directive 203, inmates are strip-searched subsequent to contact visits; that, in order to detect contraband concealed in an inmate's hair, a guard may run his finger or a comb through the inmate's hair; and that Fulcomer did not present any evidence that it would be substantially more burdensome to search an inmate with long hair than to search an inmate with short hair. Consequently the court concluded that enforcement of Administrative Directive 807 against Cole is an exaggerated response to the defendants' concern with preventing concealment of contraband.

The Commonwealth argues on appeal that the district court took too narrow a view of the issue. According to the Commonwealth's witnesses, searching hair as part of a strip-search is dangerous since the inmates, because they are naked, may act out or assault a guard when touched by the guard about the head and hair. They asserted that guards have been assaulted while trying to search hair. Therefore, the prison officials stated, one objective during strip-searching is to minimize the need for the guard to touch the inmate. Long hair, especially if it is in a ponytail or is braided, increases the time and contact needed for a

thorough search. Finally, the Commonwealth contends that, as its experts testified, since contraband is a problem inside the prison, separate and apart from the visiting room, long hair would have to be checked periodically, and there are not enough guards to do this.

### C. *The Homosexual Predation Justification*

The Commonwealth maintains that Directive 807 promotes institutional security by reducing the incidence of assaults on other prisoners by predatory homosexuals and by generally reducing the security problems alleged to result from prison homosexuality. The Commonwealth's experts testified to a belief that a correlation exists between security problems resulting from prison homosexuality and long hair, and that predatory homosexuals are more likely to attack or become involved in a fight over a long-haired inmate than a short-haired one.[6] They also testified that prison officials in other states recognize this problem.

The district court found that predatory homosexuals present a serious security problem at state correctional facilities, and that many fights between inmates result from one inmate seeking sexual favors from another. However, while conceding the sincerity of Fulcomer's belief that a correlation exists between homosexuality related security problems and long hair, the court also found Fulcomer's belief unreasonable because the Commonwealth's witnesses could point to no documentary evidence of the claimed correlation.

### D. *The Safety and Sanitation Justification*

The Commonwealth offered evidence that allowing an inmate to wear his hair long involves a substantial risk to safety and sanitation when an inmate works around machinery and food service. The Commonwealth's testimony on this issue

---

**6.** This testimony was based variously on personal observations (Superintendent Zimmerman), direct counselling sessions—including inmate histories (Dr. Mazurkiewicz), and a scholarly study (Superintendent Jeffes).

was that hair nets, hats, and caps, Cole's proffered alternatives, could not be a total solution to this problem because, even when an inmate's hair length is within the guidelines of Directive 807, his hair still comes out of the nets on occasion. According to the Commonwealth's witnesses, hats and nets simply could not control hair that is longer than permitted by the directive.

The district court found this testimony "incredible" and viewed Directive 807 to be an exaggerated response to the Commonwealth's concerns of safety and sanitation in the prison.

### E. The Institutional Discipline Justification

Finally, the Commonwealth's witnesses testified that institutional security is threatened by selective enforcement of Bureau of Correction directives according special privileges for particular inmates. The problems are said to include inmates gaining positions of leadership or control, a general lessening of respect for authority and for the rules, inmates acting out against those who have gained the exception, and the lessening of staff and inmate morale.

Cole argues that this justification, though sincerely advanced, is unreasonable. He points to satisfactory experience with the granting of special exceptions to other inmate groups, for example, to Muslims who are served special diets without pork. Although it did not deal with this justification in terms, the district court's judgment in Cole's favor indicates that it implicitly rejected it, as it did all the other proffered justifications, as exaggerated or unreasonable.

### III. THE APPLICABLE LAW

While "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison," *Bell v. Wolfish,* 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979), their right to practice their religion "may be reasonably restricted in order to facilitate the maintenance of proper discipline in the prison." *United States ex rel. Jones v. Rundle,* 453 F.2d 147, 149 (3d Cir.1971). In *St. Claire v. Cuyler,* 634 F.2d 109 (3d Cir.1980), we had occasion to review the cases in this area of the law, and we concluded:

the state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security. This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are "held 'sincerely' and [are] arguably correct." ... In determining whether the state has met its burden of production, the court must be mindful of the Supreme Court's instruction [*Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 133 [97 S.Ct. 2532, 2541, 53 L.Ed.2d 629] (1977)] that restrictions on first amendment rights may be deemed valid when prison officials in the exercise of their informed discretion, conclude that there is a potential danger to security, even though the same showing might be unimpressive if submitted to justify restrictions upon members of the general public.... Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by "substantial evidence ... that the officials have exaggerated their response" to security considerations ... or that their beliefs are unreasonable....

*Id.* at 114–15 (citations and footnotes omitted).[7]

---

7. We note that the import of the phrase "substantial evidence" may be unclear in light of the fact that, in the administrative law context, for example, the "substantial evidence" burden is not a great one. *See, e.g., Kelly v. Railroad Retirement Bd.,* 625 F.2d 486, 495 (3d Cir.1980) (Substantial evidence "is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" (Quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971))). In this instance, however, the phrase originates in *Pell v. Procunier,* 417 U.S. 817, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974), in the context of a discussion of the

We recently applied the teachings of *St. Claire* in *Dreibelbis v. Marks*, 742 F.2d 792 (3d Cir.1984). *Dreibelbis* was a suit by an inmate of the State Correctional Institution at Dallas, Pennsylvania, who was an ordained minister of a religious faith known as the Church of Prophetic Meditation, one of the tenets of which prohibits members from cutting hair from any part of their bodies. When Dreibelbis refused to comply with Directive 807, he received three misconduct reports resulting in loss of privileges, segregated confinement, and loss of his prison job. The district court accepted Dreibelbis's representations that his beliefs were sincerely held and that they required that he never cut his hair or beard.

Defendants moved for summary judgment, supporting their motion with the affidavit of Pennsylvania Commissioner of Corrections Marks, an officer with more than twenty years of service in the Pennsylvania corrections system. Marks expressed the opinion that Directive 807 furthered security and order within the state correctional institutions. He stated that correctional staff members must be able to identify inmates to avoid situations where altered appearances enable escapes from custody because of mistaken identity, and that the restrictions in Directive 807 prevent inmates from making a radical change in appearance that would make identification problematic. Additionally, Marks submitted that the restrictions on long hair and beards make it more difficult for prisoners to conceal contraband on the person, thereby increasing the security of an institution. Marks also stated that the hair regulation assists in controlling homosexuality within the correctional institution. Finally, the Marks affidavit represented that inmates in the prison work programs who have long hair and beards would create a dangerous situation for themselves and their co-workers, and that in the case of food service preparation, sanitation is improved by the restriction on long hair.

Dreibelbis opposed the motion for summary judgment, filing numerous affidavits of prisoners in the Dallas and other Pennsylvania correctional institutions to the general effect that Directive 807 is not uniformly enforced. He did not, however, offer any affidavits controverting the security dangers referred to by Commissioner Marks in his affidavit.

The district court held that the prison official's proffered justifications for Directive 807 were legitimate concerns directly related to prison security, and thus that they legally supported the directive. The court concluded that the affidavits filed by the plaintiff were not relevant to his first amendment argument and that he had not made a selective enforcement claim as to which they conceivably might be relevant. Accordingly, the court entered summary judgment for the defendants. In affirming the grant of summary judgment Judge Maris, speaking for this court, wrote:

> There is nothing in the record to suggest that these opinions by an expert of many years experience are not sincerely held. They are certainly arguably correct. They, therefore, satisfied the defendant's burden of proof of validity of the directive and the burden passed to the plaintiff to prove "by substantial evidence that the officials have exaggerated their response to security considerations or that their beliefs are unreasonable." This he has wholly failed to do, his affidavits merely tending to indicate that the directive was not uniformly enforced at Dallas and other Pennsylvania institutions. But selective enforcement or other forms of discrimination were not averred in the complaint and were not issues in the case before the district court. Moreover, the affidavits fail to reveal the intentional or purposeful discrimination which would be necessary to support such a claim. *See Flores v. Pierce*, 617 F.2d 1386, 1389 (9th Cir.),

deference that courts should ordinarily show to the judgment of prison officials. *Id.* 417 U.S. at 827, 94 S.Ct. at 2806. Thus, "substantial evidence" indicates here that the prisoner is faced

with a heavy burden when trying to prove that prison officials' beliefs are unreasonable or that a regulation is an exaggerated response to security considerations.

*cert. denied,* 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980)....

*Dreibelbis,* 742 F.2d at 795.

## IV. *DISCUSSION*

Although the district court held in Cole's favor, it initially found that Fulcomer's beliefs regarding the necessity of enforcing Directive 807 were sincerely held and arguably correct. This finding is unassailable in light of the record; moreover, it is required by our decision in *Dreibelbis,* which preceded the district court's opinion in this case. The justifications offered for Directive 807 by the prison officials in *Dreibelbis* are identical to those offered by the prison officials here, and we stated in that case that these justifications were based on sincerely held beliefs and were "certainly arguably correct." *Dreibelbis,* 742 F.2d at 795. The district court in the case before us thus acted properly when it turned to a determination of whether Fulcomer's beliefs about the need for short hair are unreasonable and whether Directive 807 is an exaggerated response to security concerns.

■ Before we evaluate the district court's conclusion that Directive 807 is too great an infringment on Cole's free exercise rights, we must determine our scope of review. Whether a regulation represents an exaggerated response to a legitimate security concern, and whether a security concern is itself unreasonable, are mixed questions of fact and law. Initially, the trial court acts as factfinder, weighing evidence offered by the prison officials in support of a regulation and evidence offered by a prisoner that the regulation is unnecessarily restrictive in light of its objectives.[8] However, as is mandated by *St. Claire* and *Dreibelbis, supra,* the court's ultimate determinations: (1) whether a proffered justification either supports the regulation or does not; and (2) whether the

prisoner has met his burden of proving by substantial evidence that the proffered justification, if *prima facie* proved, is exaggerated or unreasonable are conclusions of law. Regarding the factual component of the determinations, we must defer to the district court unless its findings are clearly erroneous. Regarding the ultimate legal conclusion, our scope of review is plenary. *See Alexander Hamilton Life Insurance Company of America v. Government of the Virgin Islands,* 534 F.2d 757, at 538–539 (3d Cir.1985).

■ We first address the district court's conclusion that the officials' belief that Directive 807 is a necessary part of the prison identification system is unreasonable. We believe that this conclusion was incorrect. The foundation for the court's determination was its acceptance of Cole's hypothesis that, if the relationship between hair length and identification were so great, no inmate would be photographed for his identification card without first having his hair cut, and Directive 807 would be more uniformly enforced during one's incarceration. Cole's evidence merely proved, however, that three inmates in Huntingdon have managed to circumvent the requirements of the directive—and two are the subject of judicial proceedings. The district court's finding (number 25, 588 F.Supp. at 774) that inmates "are not consistently required to be clean shaven and to have their hair cut when they are photographed upon commitment to the correctional system" is, therefore, clearly erroneous. Three arguable exceptions to a rule applicable to over 1500 inmates does not amount to inconsistent enforcement. In sum, the viability of the identification justification as we have explained it *supra* is not undermined by the fact that a few inmates have not had their hair cut prior to being photographed, or have been able to grow long hair while in

---

**8.** It may be difficult to see the factual component of this question in the case *sub judice* because of the nature of the record; except with respect to the identification rationale, Cole relied on legal argument to challenge the propriety of Directive 807, and did not seriously attempt to dispute the factual basis of Fulcomer's case. The factfinding process would be much more evident in a case where the prisoner relied more on his own witness(es) to testify that the prison officials' various beliefs about the need for short hair are not grounded in reality.

prison, by resistance, stealth, or even through institutional negligence or incompetence. Cole has not, therefore, met his heavy burden of showing that the Commonwealth is unreasonable in its concern that long hair makes the identification of prisoners and escapees more difficult, or that Directive 807 is an exaggerated response to this concern.

The district court's conclusion that the prison officials' belief regarding the correlation between long hair and the problem of predatory homosexuals is unreasonable also cannot pass muster. Four expert witnesses, all of whom are prison wardens, testified to the legitimacy of this concern. Cole introduced no evidence. The district court is, of course, entitled to discredit the testimony of any expert. In this case, however, the district court did not discredit their testimony, but instead held that, because the experts lacked documentation about homosexual rape, the directive is an unreasonable response to the alleged threat. Given that the district court is required to defer to the informed discretion of prison officials unless the prisoner makes a strong showing of unreasonableness, the mere fact that the Commonwealth did not provide documentary support for the opinions testified to by its experts is not a sufficient basis for the court to have concluded that the proffered justification is unreasonable. Thus Fulcomer's concern about the increase in predatory homosexual attacks if inmates are permitted to wear long hair must stand as a reasonable belief to which Directive 807 is not an exaggerated response.

The Commonwealth's position on contraband appears more problematic given the extensive measures routinely taken after every contact visit to detect contraband in long or short hair. However, in view of the additional onus of inspecting long hair and the invitation to acting out and aggressive responses that the inspection entails, at least according to the record, we again conclude that the district court was incorrect in deciding that Directive 807 was an exaggerated response to this particular concern.

■ We need not address the remaining justifications offered by the Commonwealth in support of Directive 807, which are less well developed on the record, for the three that we have discussed—the need for short hair for an effective identification system, the correlation between hair length and predatory homosexual problems, and the problem of using long hair to hide contraband—are more than sufficient for us to conclude that the hair length directive is not an invalid infringement on Cole's first amendment free exercise rights.[9]

## V. CONCLUSION

The beliefs asserted by Cole are religious in character. They are also sincere. Because convicted prisoners do not forfeit constitutional protections, Cole's protected rights may not be unduly or unjustifiably impinged. Indeed, in the prison setting, with all its attendant deprivations, the right to pursue one's religious beliefs may assume even greater significance than elsewhere. We thus do not denigrate Cole's position. Under *St. Claire* and *Dreibelbis*, however, once the state proffers sincerely held and arguably correct beliefs regarding the necessity of a regulation that impinges upon the first amendment rights of a pris-

9. We are aware that two other circuits that considered similar justifications for hair regulations by prison wardens upheld the claim of American Indian inmates that the regulations unduly infringed their first amendment rights. *Gallahan v. Hollyfield,* 670 F.2d 1345, 1346–47 (4th Cir.1982); *Teterud v. Burns,* 522 F.2d 357, 362 (8th Cir.1975). In both cases the court found the justifications either overly broad or lacking in substance, and pointed to less restrictive alternatives for coping with the asserted problems: e.g., periodic rephotographing to maintain accurate records and searching the hair for contraband. Neither of these courts was faced with the predator homosexual justification, however, and the record in these cases in support of the justifications that were offered appears to have been far less developed than the record here. More importantly, this court has rejected the notion that prison officials must choose the least restrictive regulation consistent with prison discipline. *See St. Claire,* 634 F.2d at 114 (3d Cir.1980).

oner—which the Commonwealth has done here—the burden is on the prisoner to make a showing by substantial evidence that these beliefs are unreasonable or that the regulation is an exaggerated response. Cole clearly has not done so here. We will, therefore, reverse the judgment of the district court and remand the case with directions that judgment be entered for the appellant.

Parties to bear their own costs.