761 F.2d 921
 Stephen Roger WILSON, Appellant in No. 84-3023,
v.
Co. George SCHILLINGER, Co. C.J. Simpson, Captain Tohey,
Hospital Supervisor Mr. Morrach, Education Supervisor Mr.
Sattler, Miss Moore, Mr. Petsock, Mr. Weyandt, Mr. Wigton
and E.J. Locher, Appellants in No. 83-5914.
 Nos. 83-5914, 84-3023.
 United States Court of Appeals,
Third Circuit.
 Argued March 12, 1985.
Decided May 1, 1985.
 
 Stephen D. Brown, Alison M. Benders (argued), Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellant and cross-appellee, Stephen Roger Wilson.
 Leroy S. Zimmerman, Atty. Gen., Sheila M. Ford, Deputy Atty. Gen. (argued), Allen C. Warshaw, Sr. Deputy Atty. Gen. & Chief, Litigation Section, Andrew S. Gordon, Sr. Deputy Atty. Gen., Harrisburg, Pa., for appellees and cross-appellants.
 Before HUNTER, GARTH and VAN DUSEN, Circuit Judges.
 OPINION OF THE COURT
 VAN DUSEN, Senior Circuit Judge.
 
 
 1
 The plaintiff, Stephen Roger Wilson, brought an action under 42 U.S.C. Sec. 1983 (1982) in federal district court against defendants,[1] who are prison officials at the State Correctional Institution at Pittsburgh (SCIP). Plaintiff alleged that defendants denied him the free exercise of religion and the right to equal protection by their enforcement of a prisoner grooming regulation against him. Plaintiff, a Rastafarian, contended that the regulation conflicts with a tenet of his religion that proscribes members from touching their hair with sharp objects. Moreover, plaintiff contended that the regulation has been enforced discriminatorily. The district court held that defendants did deny plaintiff his freedom of religion and enjoined them from further enforcement of the grooming regulation against him. The court, however, reached no conclusion as to the equal protection claim. Finally, the court denied plaintiff's request for monetary damages, holding that defendants were entitled to qualified immunity for their actions.
 
 
 2
 Both parties filed timely appeals of the district court's judgment. This court has jurisdiction pursuant to 28 U.S.C. Sec. 1291 (1982). For the reasons stated in this opinion, we will vacate the judgment of the district court and direct the entry of judgment for defendants.I. Facts
 
 
 3
 Plaintiff is a member of the Rastafarian religion. Rastafarians abide by the dictates of the Old Testament which forbid sharp objects from touching the hair on their bodies. As a Rastafarian, plaintiff does not wish to cut the hair on his head.
 
 
 4
 Upon entering the Pennsylvania prison system, plaintiff was processed at the Western Diagnostic and Classification Clinic at SCIP. While in the clinic on August 17, 1982, defendant George Schillinger, a corrections officer at SCIP, ordered plaintiff to get his hair cut. Schillinger gave the order pursuant to Administrative Directive 807 of the Pennsylvania Bureau of Correction (promulgated in 1972), which restricts male inmates from having hair that falls below the top of the collar in length and beards or goatees that are longer than three inches.[2] Plaintiff did not comply, explaining that it was contrary to his religious beliefs to cut his hair. As a result, Schillinger filed a misconduct report against plaintiff. The report, which cited plaintiff for "failure to obey an order" and "failure to follow the safety and sanitation regulations," was approved by defendant E.J. Locher and delivered to plaintiff by defendant C.J. Simpson, both of whom were corrections officers at SCIP.
 
 
 5
 On August 19, 1982, SCIP held a misconduct hearing before defendants Captain Lawrence Tohey, Joseph Morrash, and Leroy Sattler. At the hearing, plaintiff again explained that his refusal to cut his hair was based on his religious beliefs. The committee nevertheless sentenced plaintiff to thirty days in "A range," a punitive segregation unit.
 
 
 6
 Plaintiff then appealed his sentence to the Program Review Committee (PRC) of the prison. The PRC, which consisted of defendants Margaret Moore, James Wigton, and Lawrence Weyandt, heard plaintiff's appeal on September 9, 1982. At the hearing, the committee advised plaintiff of the procedure to follow in obtaining a religious exemption. During the hearing, Ms. Moore acknowledged the existence of the Rastafarian religion and of its tenet forbidding members to cut their hair. Nevertheless, the PRC affirmed the decision of the misconduct hearing committee and ordered that plaintiff be returned to punitive segregation to complete his sentence. Plaintiff stated his intention to pursue the matter further in federal court.
 
 
 7
 While serving his sentence, plaintiff appealed the decision of the PRC to defendant George Petsock, the superintendent of SCIP. Because plaintiff's appeal of the PRC's decision was based on a request for a religious exemption, rather than a challenge to the finding that he violated Directive 807, Superintendent Petsock declined to alter plaintiff's punishment.
 
 
 8
 In contrast to their treatment of plaintiff for his refusal to cut his hair, prison officials at SCIP did not enforce Directive 807 against at least one inmate, who adheres to an American Indian religion.[3] Defendant Wigton testified that he did not enforce the grooming regulation against American Indians because he believed they had been granted an exemption by the Bureau of Correction. Wigton testified at a supplemental hearing that his belief was incorrect and that no such exemption from Directive 807 has been granted to American Indians or any other religious group.[4]
 
 
 9
 Shortly after plaintiff served his disciplinary sentence at SCIP, his classification process was completed and he was transferred to the State Correctional Institution at Huntingdon (SCIH). Plaintiff has remained at SCIH except for the brief periods in which he was returned to SCIP for the district court proceedings in this case that were conducted in Pittsburgh. Plaintiff testified that Directive 807 has not been enforced against many of his fellow inmates at SCIH, although it is being enforced against him. Moreover, plaintiff asserts that, on his several brief return trips to SCIP, he has seen many inmates whose hair is longer than permitted and who have not been placed in punitive segregation. According to defendant Wigton, some violators of Directive 807 at SCIP now receive alternative forms of punishment if there is no available space in the punitive segregation units at the prison. Hearing at 38-39, Wilson v. Schillinger, No. 82-1801 (W.D.Pa. Sept. 26, 1983) (testimony of Wigton).
 
 II. Procedural History
 
 10
 Plaintiff Wilson submitted his complaint in this action on August 26, 1982, in the Western District of Pennsylvania. On August 30, a United States Magistrate granted plaintiff leave to proceed in forma pauperis. The case was referred to the magistrate for preliminary findings of fact and a recommendation for disposition. The magistrate conducted an evidentiary hearing on April 25, 1983. Following the discovery by two of defendants' witnesses that they had given erroneous information at that hearing, a supplemental hearing was held on September 26, 1983.
 
 
 11
 The magistrate subsequently filed his report and recommendation, which concluded that defendants had denied plaintiff the freedom to exercise his religion. Wilson v. Schillinger, No. 82-1801 (W.D.Pa. Oct. 14, 1983) (Magistrate's Report and Recommendation and Proposed Findings of Fact and Proposed Conclusions of Law) (hereinafter Wilson, No. 82-1801) (magistrate's incorporated report). The magistrate recommended that defendants be enjoined from enforcing Directive 807 against plaintiff, but that plaintiff be denied his request for money damages because defendants were entitled to qualified immunity for their actions. On November 30, 1983, the district court filed an order adopting the magistrate's report and recommendation as amended in an accompanying memorandum opinion. Wilson v. Schillinger, No. 82-1801 (W.D.Pa. Nov. 30, 1983) (Memorandum Opinion and Order) (hereinafter Wilson, No. 82-1801).[5]
 
 
 12
 Defendants filed a notice of appeal to this court (No. 83-5914) on December 23, 1983. Plaintiff subsequently filed his appeal (No. 84-3023) on January 3, 1984. A motion for appointment of counsel to represent plaintiff in this appeal was granted.
 
 III. Plaintiff's Free Exercise Claim
 
 13
 Plaintiff's first alleged deprivation of constitutional rights under 42 U.S.C. Sec. 1983[6] is that defendants have denied him the freedom to exercise his religion as guaranteed by the First Amendment and applied to the states under the Fourteenth Amendment. By being required to cut his hair, plaintiff alleges, he was forced to act contrary to his Rastafarian religious beliefs.
 
 
 14
 As an initial matter, this court has set forth two threshold requirements that must be satisfied before particular beliefs, which are alleged to be religious, are accorded First Amendment protection. A court must determine that the avowed beliefs are "(1) sincerely held, and (2) religious in nature, in the claimant's scheme of things." Africa v. Com. of Pa., 662 F.2d 1025, 1029-30 (3d Cir.1981). Defendants have not alleged that plaintiff's beliefs do not satisfy these two requirements, and the district court has specifically found that plaintiff's beliefs are sincerely held and religious in nature. Wilson, No. 82-1801, at 2; Record at A-39. We therefore defer to the district court's findings on this issue and proceed to determine the extent of First Amendment protection to which plaintiff is entitled.
 
 
 15
 It is well established that inmates do not forfeit all of their constitutional protections by reason of their conviction and confinement in prison. Bell v. Wolfish, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). Nevertheless, prisoners' constitutional rights are subject to limitations and restrictions that would be intolerable if imposed against the general public. Id. at 546, 99 S.Ct. at 1877. Specifically, prisoners' exercise of First Amendment freedoms may be curtailed when, in the informed judgment of prison officials, such exercise poses "the likelihood of disruption to prison order or stability, or otherwise interferes with the legitimate penological objectives of the prison environment." Jones v. North Carolina Prisoners' Labor Union, 433 U.S. 119, 132, 97 S.Ct. 2532, 2541, 53 L.Ed.2d 629 (1977).
 
 
 16
 This court has considered challenges to prison regulations that allegedly interfere with inmates' First Amendment rights. In St. Claire v. Cuyler, 634 F.2d 109 (3d Cir.1980), the court outlined the burden of proof in such cases as follows:
 
 
 17
 "[T]he state needs only to produce evidence that to permit the exercise of first amendment rights would create a potential danger to institutional security. This evidence may consist of expert testimony from the responsible officials, provided they testify to opinions that are 'held "sincerely" and [are] arguably correct.' ... Once the state has met its burden of going forward with the evidence, the courts must defer to the expert judgment of the prison officials unless the prisoner proves by 'substantial evidence ... that the officials have exaggerated their response' to security considerations ... or that their beliefs are unreasonable...."
 
 
 18
 Id. at 114-15 (footnote and citations omitted). The district court relied on the St. Claire analysis in reaching its conclusion that Directive 807 impermissibly interfered with plaintiff's freedom to practice his religion.
 
 
 19
 Before we evaluate the district court's conclusion, we must first outline our scope of review. This court has recently examined a court's application of the St. Claire analysis to determine which of its functions are findings of fact subject to a "clearly erroneous" scope of review by this court and which are conclusions of law subject to plenary review:
 
 
 20
 "Initially, the trial court acts as factfinder, weighing evidence offered by the prison officials in support of a regulation and evidence offered by a prisoner that the regulation is unnecessarily restrictive in light of its objectives. However, as is mandated by St. Claire and [Dreibelbis v. Marks, 742 F.2d 792 (3d Cir.1984) ] the court's ultimate determinations: (1) whether a proffered justification either supports the regulation or does not; and (2) whether the prisoner has met his burden of proving by substantial evidence that the proffered justification, if prima facie provided, is exaggerated or unreasonable are, however, conclusions of law. Regarding the factual component of the determinations, we must defer to the district court unless its findings are clearly erroneous. Regarding the ultimate legal conclusion, our scope of review is plenary. See Alexander Hamilton Life Insurance Company of America v. Government of the Virgin Islands, 757 F.2d 534, 539 (3d Cir.1985)." (Footnote omitted.)
 
 
 21
 Cole v. Flick, 758 F.2d 124, 130 (3d Cir.1985).
 
 
 22
 To satisfy their burden of producing evidence to justify Directive 807, defendants offered the testimony of SCIP's Deputy Superintendent for Treatment, James Wigton. Wigton stated three primary reasons for the directive.
 
 
 23
 First, he maintained that long hair creates a definite security problem because it enhances an inmate's ability to transport contraband throughout the prison: items of contraband such as small weapons or controlled substances can be hidden in an inmate's hair if it is long enough.
 
 
 24
 The second stated justification for Directive 807 is that long hair contributes to unsanitary conditions in the prison. Wigton maintained that an inmate's long hair increases the possibility of infection and lice, among other things.
 
 
 25
 Finally, Wigton contends that the grooming regulation assists in controlling homosexual activity within the prison. He testified that male inmates with long hair tend to appear more attractive to other male inmates and thereby increase the likelihood of homosexual attacks within the prison.
 
 
 26
 Wigton's stated justifications for Directive 807 are reiterated in an affidavit by Ronald J. Marks, which was submitted in support of defendants' motion for summary judgment. Marks, then the Commissioner of the Pennsylvania Bureau of Correction, listed the three justifications for Directive 807 identified by Wigton. Marks also added a fourth justification: inmates with long hair or beards may be able to effectively thwart identification. By being required to maintain their hair and beards at a short length, he contended, inmates are prevented from radically altering their appearance. Marks stated that all inmates are photographed upon entry into the state prison system, and if an inmate were able to escape custody after altering his appearance by changing his hair style, it would be much more difficult for law-enforcement officials to capture him.
 
 
 27
 After reviewing defendants' stated justifications for Directive 807, as well as plaintiff's testimony rebutting those justifications, the district court reached the conclusion that defendants had failed to sustain the initial burden of production imposed by St. Claire. The court cited several facts in support of its conclusion: the ease with which the defendants accepted, though mistakenly, an exemption from Directive 807 for American Indians; the absence of any grooming regulation for women inmates in the state correctional institutions for women; and the failure of defendants to swiftly enforce Directive 807 against other inmates in the general prison population at SCIP. See Wilson, No. 82-1801, at 8-9 (magistrate's incorporated report); Record at A-30 to A-31. In general, the district court found the defendants' testimony to be unpersuasive and, therefore, held that they had not met their burden of producing evidence that plaintiff's exercise of his religion by growing his hair creates a potential danger to institutional security.
 
 
 28
 In Dreibelbis v. Marks, 742 F.2d 792 (3d Cir.1984), this court addressed the very same issue which this appeal raises. The district court here, however, did not have the benefit of our Dreibelbis decision because Dreibelbis was filed some ten months after the district court decision in the instant case. In Dreibelbis, this court was presented with similar evidence by prison officials in the face of a challenge to Directive 807 by a prisoner asserting his freedom of religion. In that case, Commissioner Marks submitted an affidavit listing the same justifications for Directive 807 as were listed in his affidavit in this case. The court followed St. Claire's direction that the state may sustain its burden of production by presenting expert testimony from prison officials, provided they testify to opinions that are sincerely held and arguably correct. Dreibelbis, 742 F.2d at 794. The court in Dreibelbis concluded that Marks' affidavit was sufficient to satisfy the state's burden of production because his opinions were arguably correct and there was no evidence to suggest that they were not sincerely held.
 
 
 29
 Again, in this case the justifications for Directive 807 proffered by Deputy Superintendent Wigton are arguably correct and there is no suggestion that they are not sincerely held. The dissent in Dreibelbis contended that two facts suggested that the opinion rendered by Commissioner Marks was not sincerely held. The dissent argued that the absence of any hair-length regulations for female inmates and the failure of prison officials to enforce Directive 807 against some male inmates demonstrated that Marks' security justifications for the grooming regulation were pretextual. These two facts are also present in this case and indeed were the primary basis for the district court's conclusion that defendants failed to sustain their burden of production. Nevertheless, the court in Dreibelbis rejected the significance placed on these facts by the dissent and ruled, as a matter of law, that they did not negate the evidence presented by defendants to satisfy their burden of production.
 
 
 30
 In the exercise of our plenary review of the district court's legal conclusions, we therefore must conclude, as did the court in Dreibelbis, that defendants have satisfied their burden of production by the presentation of expert testimony.[7] Thus, the district court erred in concluding to the contrary.
 
 
 31
 Because the district court determined that defendants had failed to meet their initial burden, it did not reach a conclusion regarding the second stage of the St. Claire analysis: did plaintiff prove by substantial evidence that the prison officials had exaggerated their response to security considerations or that their beliefs were unreasonable? The district court seems to have misapplied St. Claire by combining the two-step analysis into one step. The court apparently weighed the arguments and evidence of both parties and then concluded that defendants had not satisfied their initial burden of production. For its analysis the district court relied on Gallahan v. Hollyfield, 670 F.2d 1345 (4th Cir.1982), a decision of the Court of Appeals for the Fourth Circuit. In Gallahan, the court applied a test different from the St. Claire analysis used by courts in this circuit. Gallahan requires that a prison regulation infringing on First Amendment freedoms be the least-restrictive means of achieving a legitimate purpose. See id. at 1346. By contrast, the St. Claire analysis requires a court to accord much more deference to the informed judgments of prison officials. Thus, the balancing test seemingly applied by the district court in this case was inappropriate.
 
 
 32
 We will now examine the evidence presented by plaintiff to determine, as a matter of law, whether plaintiff sustained his burden of proof as required by St. Claire. We note that, in contrast to the light burden that constitutes the "substantial evidence" standard in the administrative-law context, the "substantial evidence" burden imposed on the plaintiff by St. Claire is quite heavy. Cole v. Flick, 758 F.2d 124, 128 n. 7 (3d Cir.1985).
 
 
 33
 It should be noted initially that plaintiff did not introduce expert testimony to demonstrate that the prison officials had exaggerated their response. Rather, the only evidence that plaintiff produced was his own testimony and the cross-examination of defendants' witnesses. He was able to establish--and the district court found significant--the fact that, during a period when the prison's punitive segregation units were fully occupied, there were other inmates in the general prison population at SCIP whose hair exceeded the length permitted by Directive 807. Plaintiff also established that defendants did not enforce Directive 807 against an American Indian inmate at SCIP. On cross-examination, defendants' witnesses stated that there had been no significant increase in the security problems they claimed were a result of inmates wearing long hair. Nevertheless, the mere establishment that some inmates were able to remain in the general prison population with long hair is insufficient to sustain plaintiff's burden of showing that prison officials have exaggerated their response to security concerns or held beliefs that are unreasonable. See Dreibelbis, 742 F.2d at 795. Because defendants needed to prove only the potential--as opposed to actual--security problems to be prevented by Directive 807, St. Claire, 634 F.2d at 114, the fact that these problems did not occur during a brief period in which some long-haired inmates remained in the general prison population does not necessarily rebut the potentiality of harm.
 
 
 34
 The district court maintained that defendants' testimony that long hair poses threats to prison security should be discounted because defendants produced no other evidence to support their claims. See Wilson, No. 82-1801, at 8-9 (magistrate's incorporated report); Record at A-31. Such other evidence, however, need not have been produced by defendants because their testimonial evidence was sufficient to sustain their burden of production. The lack of any supporting documentary evidence is not a valid basis for the district court to determine that defendants' proffered justifications for Directive 807 are unreasonable. Cole v. Flick, 758 F.2d 124, 131 (3d Cir.1985).
 
 
 35
 Finally, that the inmates of the state's correctional institutions for women are not subject to hair-length regulations does not suffice to prove that defendants' justifications for Directive 807 are unreasonable or exaggerated. This court has recognized that the serious security problems in men's prisons that gave rise to Directive 807 do not exist significantly in women's prisons. Dreibelbis, 742 F.2d at 795-96.
 
 
 36
 We therefore conclude, on the basis of the record before us, that plaintiff has failed to sustain his burden of proof as a matter of law. Defendants have demonstrated that Directive 807 may be enforced against plaintiff though it conflicts with his religious beliefs because the directive responds to potential dangers to prison security. Plaintiff has not shown this response to be exaggerated nor defendants' belief in the necessity of the directive to be unreasonable. Accordingly, we will vacate the district court's judgment that defendants violated plaintiff's freedom of religion by enforcing Directive 807 against him.
 
 IV. Plaintiff's Equal Protection Claim
 
 37
 Another constitutional right allegedly denied to plaintiff was that of equal protection under the laws. Plaintiff asserts that, while he was incarcerated at SCIP, defendants enforced Directive 807 against him yet not against an American Indian. Defendants reply to plaintiff's claim by asserting that they did not enforce Directive 807 against one American Indian inmate because they mistakenly believed that the Bureau of Correction had granted an exemption to Indians. Thus, they contend, there was no intentional discrimination.
 
 
 38
 We note initially that the district court made no specific findings of fact nor conclusions of law with regard to plaintiff's equal protection claims. The court did find that defendants exempted members of the American Indian religions from complying with Directive 807 because of a mistaken belief that these members had been given an exemption by the Bureau of Correction. The court also found that plaintiff is entitled to such an exemption because of his religious beliefs. See Wilson, No. 82-1801, at 12-13 (magistrate's incorporated report); Record at A-34 to A-35. Plaintiff claims that implicit in these two findings is a conclusion by the court that defendants violated plaintiff's right to equal protection. We disagree because the district court made no finding that there existed the type of intentional or purposeful discrimination that is a necessary element of an equal protection violation. See Dreibelbis, 742 F.2d 792, 796 (3d Cir.1984), citing Flores v. Pierce, 617 F.2d 1386, 1389 (9th Cir.), cert. denied, 449 U.S. 875, 101 S.Ct. 218, 66 L.Ed.2d 96 (1980); see also Snowden v. Hughes, 321 U.S. 1, 8, 64 S.Ct. 397, 401, 88 L.Ed. 497 (1944); Yick Wo v. Hopkins, 118 U.S. 356, 373-74, 6 S.Ct. 1064, 1072-1073, 30 L.Ed. 220 (1886); United States v. Torquato, 602 F.2d 564, 568 (3d Cir.1979).
 
 
 39
 Plaintiff argues in the alternative that, even if the district court made no findings or conclusions regarding his equal protection claim, this court may review the record--which consists generally of undisputed facts--and draw its own conclusions. This we decline to do because it is not necessary to the resolution of the case. For regardless of the merits of plaintiff's equal protection claim, we must conclude that he is not entitled to either form of relief he has requested.
 
 
 40
 V. Plaintiff's Request for Injunctive Relief
 
 
 41
 Upon its determination that plaintiff's freedom to exercise his religion had been infringed, the district court granted plaintiff's request that defendants be enjoined from enforcing Directive 807 against him. Wilson v. Schillinger, No. 82-1801 (W.D.Pa. Nov. 30, 1983) (order enjoining enforcement of Administrative Directive 807); Record at A-37. Subsequent to his commencing this action--though prior to the date of the district court's order--plaintiff was permanently assigned to SCIH, whose inmates are not subject to defendants' control. Since the date of his transfer, plaintiff has been returned to SCIP only for brief periods incident to his appearance at the district court's proceedings in Pittsburgh. It is highly unlikely that plaintiff will ever be incarcerated at SCIP in the future. Thus, it is difficult to understand why the district court enjoined defendants from enforcing Directive 807 against plaintiff at a time when defendants no longer had any authority over plaintiff.
 
 
 42
 On appeal, both parties apparently agree that the issue of the district court's injunction is moot because plaintiff is no longer under defendants' control. We agree. We also note that plaintiff has filed a similar claim for injunctive relief against the prison officials at SCIH, who now have authority over him.[8] That action, which has been stayed pending the outcome of this appeal, will afford plaintiff the opportunity to litigate any claims he has regarding his treatment while incarcerated at SCIH.
 
 
 43
 VI. Defendants' Qualified Immunity From Damages
 
 
 44
 The district court held that, although defendants had violated plaintiff's freedom of religion, they were entitled to qualified immunity from damages because they were acting under a reasonable and good-faith belief that their conduct was lawful. See Wilson, No. 82-1801, at 10 (magistrate's incorporated report); Record at A-32. Because we now hold that plaintiff was not impermissibly denied religious freedom, the district court's holding on qualified immunity is moot. Plaintiff's other claim--that he was denied equal protection--also cannot serve as the basis for money damages. Even if we had held that plaintiff was denied equal protection rights because an American Indian was exempted from Directive 807 and he was not, we hold on the basis of this record that defendants are entitled to immunity for their actions.
 
 
 45
 The Supreme Court has held that prison officials are entitled to qualified immunity from monetary liability if they are acting reasonably in the good-faith fulfillment of their responsibilities. Procunier v. Navarette, 434 U.S. 555, 561, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978). The Supreme Court has recently set out a test for governmental officials to establish the good faith necessary for qualified immunity. Government officials performing discretionary functions will be immune from liability for civil damages if their conduct does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 2739, 73 L.Ed.2d 396 (1982). If at the time of the alleged violation these rights are not clearly established, an official cannot reasonably be expected to know that his conduct is unlawful. Id. at 818, 102 S.Ct. at 2739; Procunier, 434 U.S. at 565, 98 S.Ct. at 861. The Supreme Court has extended the application of the Harlow "clearly established rights" standard for qualified immunity to cases, such as this one, in which defendants are sued under 42 U.S.C. Sec. 1983 (1982) for alleged deprivation of constitutional rights. Davis v. Scherer, --- U.S. ----, ----, 104 S.Ct. 3012, 3021, 82 L.Ed.2d 139 (1984). Thus, we will employ this test to determine if defendants are protected from liability for money damages.
 
 
 46
 Given our holding on his First Amendment claim, the only right that plaintiff can arguably claim was clearly established and yet violated by defendants is the constitutional right to equal protection. Thus, to avoid the recovery-preclusive effects of qualified immunity, plaintiff must have proven that defendants had reason to know they were violating plaintiff's clearly established equal protection rights by enforcing Directive 807 against him but not against the American Indian.
 
 
 47
 Although defendants enforced Directive 807 against plaintiff--who they knew was a Rastafarian--but not against a member of an American Indian religion, they did not necessarily have reason to know they were violating plaintiff's equal protection rights. In order for defendants' disparate treatment of plaintiff and the American Indian to constitute a violation of equal protection, plaintiff and the American Indian must have been similarly situated. See, e.g., Plyler v. Doe, 457 U.S. 202, 216, 102 S.Ct. 2382, 2394, 72 L.Ed.2d 786 (1982). Plaintiff would contend that both he and the American Indian were similarly situated because they both held religious beliefs against cutting their hair. We do not find error in the district court's finding that plaintiff's beliefs that he not cut his hair were sincerely held and religious in nature. Nevertheless, Rastafarianism has not been officially recognized by the Bureau of Correction as a religion, though such recognition has been given to the American Indian religions. Hearing at 38-39, Wilson v. Schillinger, No. 82-1801 (W.D.Pa. April 25, 1983) (testimony of Wigton). Recognition by the Bureau is the first step by which inmates can obtain permission to engage in religious practices that conflict with prison regulations. Because plaintiff's religion was not so recognized, his right to be exempt from Directive 807--as are inmates of other recognized religions who receive an exemption--was certainly not "clearly established." Defendants therefore would not have had reason to know that plaintiff was entitled to the same exemption as that accorded American Indians.[9]
 
 
 48
 Thus, defendants did not act contrary to a clearly established equal protection right of plaintiff and are thereby entitled to immunity from any liability to plaintiff that may have resulted from their enforcement of Directive 807.VII. Summary
 
 
 49
 In summary, we hold that the district court erred in ruling that defendants infringed plaintiff's freedom of religion by enforcing Directive 807 against him. We do not address the plaintiff's claim that he was denied equal protection because we hold that plaintiff is nevertheless not entitled to either the injunctive or monetary relief he has requested. The injunction granted by the district court no longer is effective because these defendants now have no authority over plaintiff. Thus, the injunction issue is moot on appeal. Finally, defendants are entitled to qualified immunity from liability for any possible equal protection violation resulting from their enfocement of Directive 807 against plaintiff.
 
 
 50
 Accordingly, the judgment of the district court, which held that defendants violated plaintiff's freedom of religion by enforcing Directive 807 against him, will be vacated, and we will direct the entry of judgment for defendants.
 
 
 
 [1]
 The defendants in this action are all officials at the State Correctional Institution at Pittsburgh (SCIP): Corrections Officers George Schillinger, E.J. Locher, and C.J. Simpson; Captain Lawrence Tohey; Joseph Morrash, hospital supervisor; Leroy Sattler, education supervisor; Margaret Moore; Lawrence Weyandt; Deputy Superintendent James Wigton; and Superintendent George Petsock
 
 
 [2]
 Administrative Directive 807 provides in relevant part:
 "II. MALE HAIR STYLES
 Hair that does not fall below the top of the collar in length, a beard or goatee no longer than three inches, a mustache and sideburns shall be permitted provided they are neat and clean.
 "III. FEMALE GROOMING
 A. Any feminine hair style shall be permitted.
 B. Unless otherwise determined by the Superintendent of the State Correctional Institution at Muncy, hair dyeing and tinting shall be done only by the institutional beautician.
 C. The use of all cosmetics shall be permitted in good taste."
 
 
 [3]
 A tenet of some American Indian religions is that long hair is symbolic of the Great Spirit and that interference with hair growth is interference with one's spiritual world
 
 
 [4]
 This court has recently upheld the validity of enforcing Directive 807 against an American Indian, notwithstanding his claim that, by forcing him to cut his hair, the directive denied him the freedom to exercise his religion. See Cole v. Flick, 758 F.2d 124 (3d Cir.1985)
 
 
 [5]
 Because the district court adopted the report and recommendation of the magistrate, throughout this opinion we will refer to the magistrate's findings of fact and conclusions of law as those of the district court
 
 
 [6]
 Section 1983 provides:
 "Civil action for deprivation of rights
 "Every person who, under color of any ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia."
 42 U.S.C. Sec. 1983 (1982).
 
 
 [7]
 The district court's decision in Dreibelbis was a summary judgment rendered on undisputed facts. As such, the court's decision that Commissioner Marks' affidavit satisfied defendants' burden of production was a conclusion of law. That this court affirmed the district court's grant of summary judgment in that case requires us to conclude, as a matter of law, that defendants in this case have met their initial burden of proof by presenting generally the same evidence as did the defendants in Dreibelbis. See Cole v. Flick, 758 F.2d 124, 129-130 (3d Cir.1985)
 
 
 [8]
 See Wilson v. Marks, No. 83-0782 (M.D.Pa., filed June 13, 1983)
 
 
 [9]
 That two of the defendants expressed a belief that plaintiff's prospective challenge to Directive 807 in federal court might be successful does not mean that they reasonably should have known that enforcing Directive 807 against plaintiff violated equal protection. Given the absence of any existing judicial authority holding that Rastafarianism was a religion, official recognition of plaintiff's religion by the Bureau of Correction was necessary for defendants to have reason to know that plaintiff might be entitled to certain exemptions from prison regulations
 As mentioned earlier, testimony reveals that plaintiff had been advised of the procedure to be followed so that Rastafarianism could be recognized as a religion by the Bureau of Correction, but plaintiff did not choose to accept this advice. See Wilson, No. 82-8201, at 5 (magistrate's incorporated report); Record at A-27.