17 F.3d 396
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
Carl Dean SWIFT Plaintiff,
and
David Raymond Gren, Plaintiff-Appellant,
v.
Samuel A. LEWIS, Director, et al., Defendant-Appellee.
Carl Dean SWIFT, Plaintiff-Appellant,
and
David Raymond Gren, Plaintiff,
v.
Samuel A. LEWIS, Director, et al., Defendant-Appellee.
 Nos. 92-15561, 92-15565.
 United States Court of Appeals, Ninth Circuit.
 Submitted Aug. 9, 1993.
Decided Dec. 10, 1993.
 
 Before: KOZINSKI, THOMPSON and T.G. NELSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Arizona state prisoners Carl D. Swift and David R. Gren ("the prisoners") appeal the district court's summary judgment in favor of Arizona Department of Corrections (ADOC) officials in the prisoners' 42 U.S.C. Sec. 1983 actions alleging the prison officials violated their civil rights by denying them religious exemptions from prison hair-grooming policies.
 
 
 3
 We have jurisdiction over these timely appeals under 28 U.S.C. Sec. 1291. We affirm.[1]
 
 FACTUAL AND PROCEDURAL BACKGROUND
 
 4
 Swift and Gren claim to be Christians who, as part of their religion, adhere to the Vow of the Nazarite ("Vow"). The Vow, they assert, prohibits the cutting of one's hair and beard. The Vows' prohibition of haircuts conflicted with then-existing prison grooming policies prohibiting long hair absent religious exemptions (which were given to the Sikhs and the American Indians).[2] See ADOC Internal Management Policy (IMP) 443 (September 28, 1981); IMP 207.0 (March 4, 1987); IMP 603.1 (May 22, 1987); IMP 800.1 (December 28, 1987). In 1987 and 1988, the prisoners requested religious exemptions from the prison hair-grooming policy. The prison officials denied these requests.
 
 
 5
 Swift and Gren filed independent section 1983 actions, which were later consolidated, alleging the prison officials violated their constitutional rights to free exercise of religion by denying them the requested religious exemptions. The district court granted summary judgment in favor of the ADOC officials, but we reversed this judgment on appeal and remanded the cases to the district court for it:
 
 
 6
 To determine the reasons why ADOC adopted its grooming policy. If the courts find that the reasons are reasonably related to legitimate penological interests, they should further determine whether such a grooming policy may be applied selectively to appellants, but not to members of other religious groups. The courts should determine whether appellants' practice of not cutting their hair is religious rather than secular only if such a determination is necessary to the resolution of appellants' claims.
 
 
 7
 Once a sufficient factual record is developed, the district courts should also reconsider whether the defendants are immune from damage liability because their actions were objectively reasonable in light of the legal rules that were clearly established at the time of their actions. Anderson v. Creighton, 483 U.S. 635, 638-639, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).
 
 
 8
 Swift v. Lewis, 901 F.2d 730, 733 (9th Cir.1990).
 
 
 9
 On remand, the district court granted partial summary for the ADOC officials on the prisoners' claims for declaratory and injunctive relief.[3] Swift v. Lewis, CIV 88-335 TUC ACM, at 3 (D.Ariz. Jan. 23, 1991) (Judge Marquez). Subsequently, the district court granted summary judgment for the ADOC officials on the prisoners' claims for money damages on the ground that the ADOC officials had qualified immunity. Swift v. Lewis, CIV-88-335 TUC RMB (D.Ariz. Feb. 4, 1992) (Judge Bilby). These appeals followed.
 
 DISCUSSION
 A. Civil Action for Deprivation of Rights[4]
 
 10
 We review a district court's grant of summary judgment de novo. Jones v. Union Pacific R.R. Co., 968 F.2d 937, 940 (9th Cir.1992). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). Darring v. Kincheloe, 783 F.2d 874, 876 (9th Cir.1986). We must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there is any genuine issue of material fact and whether the district court correctly applied the relevant substantive law. Federal Deposit Ins. Corp. v. O'Melveny & Meyers, 969 F.2d 744, 747 (9th Cir.1992).
 
 
 11
 We review the district court's determination of qualified immunity de novo. Lum v. Jensen, 876 F.2d 1385, 1386 (9th Cir.1989), cert. denied, 493 U.S. 1057 (1990); White v. Pierce County, 797 F.2d 812, 813 (9th Cir.1986). Whether an official may be held personally liable for an allegedly unlawful official action generally turns on the "objective legal reasonableness" of the action, assessed in light of the legal rules that were "clearly established" at the time the action was taken. Anderson v. Creighton, 483 U.S. 635, 639 (1987); Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The contours of the right allegedly violated must have been sufficiently clear and particularized so that a reasonable official would have known that what he did violated that right. Anderson, 483 U.S. at 640.
 
 
 12
 In determining whether the legal rules governing religious exemptions from prison grooming policies were clearly established at the time the ADOC officials denied Swift and Gren religious exemptions, we first look to binding precedent. See Capoeman v. Reed, 754 F.2d 1512, 1514 (9th Cir.1985). In the absence of binding precedent, we look to "whatever decisional law is available." Id. We may also consider the likelihood that this circuit or the Supreme Court would have reached the same result as courts which have previously considered the issue. Id. at 1515.
 
 
 13
 In the prisoners' section 1983 claim based on the free exercise clause of the First Amendment, the relevant inquiry is whether the prisoners, as adherents of the Vow, had a clearly established right to religious exemptions from the prison grooming policies prohibiting long hair at the time the ADOC officials denied them the exemptions.[5] See Anderson, 483 U.S. at 639 (the rule of qualified immunity would be converted into a rule of virtually unqualified liability if plaintiffs were permitted to allege violations of extremely abstract rights). At the time the ADOC officials denied the prisoners their claimed religious exemptions, it was established in this circuit that:
 
 
 14
 A religious claim, to merit protection under the free exercise clause of the First Amendment, must satisfy two basic criteria. First, the claimant's proffered belief must be sincerely held; ... Second, as the Supreme Court held in Wisconsin v. Yoder, 406 U.S. 205, 215-16, 92 S.Ct. 1526, 1532-33, 32 L.Ed.2d 15 (1972), the claim must be rooted in religious belief, not in "purely secular" philosophical concerns.
 
 
 15
 Callahan v. Woods, 658 F.2d 679, 683 (9th Cir.1981) (footnote omitted). See also Wilson v. Schillinger, 761 F.2d 921 (3rd Cir.1985) (same two factors are threshold issue in evaluating a prisoner's free-exercise argument), cert. denied, 475 U.S. 1096 (1986).
 
 
 16
 Viewing the evidence in the light most favorable to the prisoners, as we must, the ADOC officials' denials of the prisoners religious exemptions were not because the officials determined the prisoners' Vows were insincere or secular, but rather because the Vow was not a "recognized religion." Samuel Lewis, the ADOC Director, wrote to Swift:
 
 
 17
 I have reviewed your grievance appeal concerning your request to be exempted from grooming policy due to your "taking the vow of the Nazarite."
 
 
 18
 ...
 
 
 19
 In the response provided to you, you were advised that Chaplain Machain contacted religious authorities and was advised that there have not been any Nazarites in hundreds of years; therefore, the Department of Religion did not recognize your claim (insofar as being exempted from grooming policy).
 
 
 20
 Policy # 207.0, "Religious Activities, Observances and Visitation" ... provides for procedure to be followed prior to the granting of an exemption to grooming policy. In part, it states that the Institutional or Senior Chaplain is to consult an appropriate religious leader or authority prior to granting a waiver. Chaplain Machain was not able to do this in order to determine the tenets of the Nazarite--due to its not being an established faith. (It is noted that the only tenet you have discussed is the wearing of long hair.)
 
 
 21
 You certainly have the personal right to individual religious preferences and personal religious commitments. However, an institutional setting does not accommodate every personal religious belief with provisions for special diets, wearing apparel, or exemptions.
 
 
 22
 C.R. 18, Exhibit E (emphasis added). See also C.R. 18, Exhibit D (Affidavit of George Tichy); Memo from Senior Chaplain Alex Machain to Swift, dated April 7, 1987 ("[t]he fact you took the Vow is note worthy and your reasons for doing so are commendable. However, the Nazarite Vow has never been taken for an 'indetermin[ate] amount' of time"); ADOC Response on Swift's Inmate Grievance Form, June 29, 1987 ("[i]t is not possible for you to take this vow and have it recognized by any church").
 
 An ADOC official wrote to Gren that:
 
 23
 The Department of Corrections does not grant special privileges (such as hair or diet) based on a personal or optional choice. In order to have such special privileges, a person must be a member of a recognized religion that requires such a privilege as a basic tenet of their faith. The Nazarite Vow you have taken is therefore not recognized as valid by the Department of Corrections. Your concerns about having made a vow before God are understandable; however, if a person makes a vow that is contrary to the Bible, he can be released from that vow. In Romans 13; 1-2, it states "Everyone must submit himself to the governing authorities, for there is no authority except that which God has established ..."
 
 
 24
 C.R. 180, Exhibit E (emphasis added).
 
 
 25
 At the time the prisoners' requested religious exemptions were denied, however, it was also established that prisoners' constitutional rights were subject to limitations and restrictions that would be intolerable if imposed on the general public. See Bell v. Wolfish, 441 U.S. 520, 545-46 (1979). "[M]aintaining institutional security and preserving internal order and discipline are essential goals that may require limitation or retraction of the retained constitutional rights of ... convicted prisoners ..." Id. Prison officials are afforded "wide ranging deference" in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security. See id. at 547.
 
 
 26
 When the prison officials denied Swift and Gren religious exemptions from the prison grooming policies, there was no clearly established right of prisoners to wear long hair for religious reasons. See Capoeman, 754 F.2d at 1512-13 (prison officials are immune from civil rights suit because inmate's right to be free from forced haircutting for religious reasons was not clearly established). See also Pollock v. Marshall, 845 F.2d 656 (6th Cir.) (a prison may regulate the length of an inmate's hair even though the regulation conflicts with the inmate's First Amendment free exercise rights), cert. denied, 488 U.S. 897 (1988); Wilson, 761 F.2d 921 (same); Cole v. Flick, 758 F.2d 124 (3d Cir.) (same), cert. denied, 474 U.S. 921 (1985); Proffitt v. Ciccone, 506 F.2d 1020 (8th Cir.1974) (same).
 
 
 27
 Two Supreme Court cases, which were handed down in the midst of the prison officials' allegedly improper denials of religious exemptions from the hair length policies, express a continued adherence to the settled notion that "[t]he free exercise right ... is necessarily limited by the fact of incarceration, and may be curtailed in order to achieve legitimate correctional goals or to maintain prison security." O'Lone v. Shabazz, 482 U.S. 342, 348 (1987). See also Turner v. Safley, 482 U.S. 78, 89 (1987) ("[w]hen a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests").
 
 
 28
 Turner set forth four factors to be considered in determining when a regulation is reasonably related to legitimate penological interests. "First, there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it" Turner, 482 U.S. at 89 (internal citation omitted). Second, "whether there are alternative means of exercising the right that remain open to prison inmates" must be assessed. Id. at 90. Third, "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally" must be considered. Id. Fourth, the absence of ready alternatives to the regulation should be explored. "The absence of ready alternatives is evidence of the reasonableness of a regulation [and] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable." Id. (internal citation omitted).
 
 
 29
 The legitimate penological interests served by the prison hair-grooming policy were stated in an affidavit by J.C. Keeney, the ADOC Assistant Director of Adult Institutions. Mr. Keeney stated:
 
 
 30
 9. ADOC's former inmate grooming policy was IMP 443. It provided that an inmate's hair could not extend below the top of his collar absent a religious exemption....
 
 
 31
 10. The primary penological interest supporting IMP 443 was the necessity to be able to make quick inmate identification. In particular, it was felt that inmate identification was hampered by long, free-flowing hair because it impeded the ability of corrections officers to identify the facial features of inmates from side angles.
 
 
 32
 11. Quick identification of inmates is of paramount importance in a prison to quell inmate disturbances and to apprehend both escapees and inmates suspected of prison disciplinary violations. Quick and accurate identification of an inmate is also necessary for officers to complete daily security checks and inmate counts as well as to deliver mail and packages to the correct inmate recipient. Quick identification is, therefore, directly related to the overriding objective of institutional safety and security. IMP 443 was adopted in specific reaction to these concerns.
 
 
 33
 12. Various other secondary penological interest led to the adoption of IMP 443. One such interest was sanitation insofar as it was felt that short hair would help to alleviate problems such as lice and pipe clogging.
 
 
 34
 13. In addition, IMP 443 promoted the goal of reducing unnecessary contact between inmates and correctional service officers during body searches. Long hair gives inmates an additional place to hide contraband. Absent IMP 443, it would have been necessary to search inmates hair, and such additional contact, in turn, would have increased inmate-officer tension and given inmates another opportunity to assault correctional service officers. It was believed, therefore, that IMP 443 would reduce prison contraband, tension and assaults.
 
 
 35
 14. Finally, IMP 443 was adopted in an effort to curb homosexual rapes and assaults as experience taught that inmates with long hair were more often the objects of such attacks.
 
 
 36
 Affidavit of J.C. Keeney, August 8, 1990.
 
 
 37
 Our task in this case is to determine whether the prison officials were objectively reasonable in determining that the prisoners' retained constitutional rights to free-exercise of religion were overridden by the penological justifications for the prison's hair-grooming policy. Because the prison officials could not reasonably anticipate any illegality in their determination that the hair-grooming policy met the reasonable relation test of Turner, the officials are protected by qualified immunity for any violation of the prisoners' right to the free exercise of their alleged religious belief under the First Amendment.
 
 B. Discovery
 
 38
 We review the district court's rulings concerning discovery for an abuse of discretion. United States v. Bourgeois, 964 F.2d 935, 937 (9th Cir.), cert. denied, 113 S.Ct. 290 (1992). The district court did not abuse its discretion by limiting the prisoners' scope and extent of discovery requests that had been propounded before the qualified immunity question was resolved. See Harlow, 457 U.S. at 818 ("[u]ntil th[e] threshold immunity question is resolved, discovery should not be allowed").
 
 CONCLUSION
 
 39
 We affirm the district court's dismissal of the prisoners' section 1983 claims based on their allegations that the denial of their requested exemptions violated their rights to the free exercise of their religion under the First Amendment. The officials are protected by qualified immunity from these claims.
 
 
 40
 AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for disposition without oral argument. Fed.R.App.P. 34(a); 9th Cir.R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 We grant appellees' motion to strike the exhibits in the prisoners' opening brief
 
 
 [2]
 The Vows' prohibition of cutting one's beard did not conflict with then-existing prison grooming regulations, which permitted beards
 
 
 [3]
 After the prisoners' section 1983 suits were filed, the ADOC amended its grooming policy to allow long hair, but to prohibit the growing of beards absent a valid medical reason. See IMP 304.7 (Oct. 6, 1988). The new grooming policy did not provide for any religious exemptions. Relying in principle on Friedman v. Arizona, 912 F.2d 328 (9th Cir.1990), cert. denied, 498 U.S. 1100 (1991), the district court found that the grooming policy prohibiting beards was reasonably related to valid penological interests
 
 
 [4]
 Section 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 42 U.S.C. Sec. 1983.
 
 
 [5]
 For the prisoners to prevail on their section 1983 claims, they must establish that, under color of state law, they were deprived of a right secured by the Constitution or laws of the United States. See Kennedy v. Los Angeles Police Dept., 901 F.2d 702, 705 (9th Cir.1989)